## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAUREL HILBERT,<br><br>2039 New Hampshire Avenue, N.W.<br>Washington, D.C. 20009<br><br>    *Plaintiff,*<br><br>v.<br><br>EVENT WORKFORCE GROUP (USA) INC.<br>3000 Lawrence Street, Unit 27<br>Denver, CO 80215<br><br>    *Defendant.* | **Case No.**<br><br><br><br><br><br>**Class Action Complaint**<br><br>**Jury Trial Demand** |

## VERIFIED COMPLAINT

## INTRODUCTION

1. Plaintiff, Mr. Laurel Hilbert asserts the following claims against Defendant Event Workforce Group (USA) Inc. doing business as Rosterfy ("Defendant") as follows:

2. The Supreme Court of the United States has stated "[t]he Internet's prevalence and power have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of Americans had Internet access whereas by 2018 the number increased to roughly eighty-nine (89) percent). This number has steadily increased as polling data from 2023 shows ninety-five (95) percent of American adults use the Internet.[1]

---

[1] Internet/Broadband Fact Sheet, Pᴇᴡ Rᴇsᴇᴀʀᴄʜ Cᴇɴᴛᴇʀ https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited March 9, 2024). Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

DocuSign Envelope ID: 22A2BDFD-D988-4A5B-A6FF-1BE8F5E9433B9

3.     Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2]  According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 418,500 visually impaired persons lived in the State of New York.[3]

4.     Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update and operate its website and/or mobile application platforms (hereinafter "Website") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.     Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.     For this significant portion of Americans, accessing websites, mobile applications, and other information has become a necessity, not a convenience.

7.     The growth of usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

8.     The U.S. Chamber of Commerce has documented consumers' increasing reliance on the internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience,

---

[2]     Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2022), https://www.disabilitystatistics.org/report/pdf/2022/2000000 (last visited March 9, 2024).  The report uses data from the 2018 American Community Survey.
[3]     Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited March 9, 2024).

affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[4]

New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[5]

9.      Even the Supreme Court has acknowledged the phrase, "'There's an app for that' has become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1518, 203 L.Ed.2d 802, 806 (2019).

10.     But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[6]

11.     This is especially true with respect to accessing goods and services over the internet, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication,

---

[4]      Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed March 9, 2024).

[5]      Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping*, U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile- friendly-ecommerce-websites (last accessed March 9, 2024).  "According to one report, e- commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce  (Jan.                28,                2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed March 9, 2024).

[6]      *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed June 14, 2022); *see also* Progress Report 2023: Towards Economic Security: The Impact of Income and Asset Limits on People with Disabilities (2023), https://www.ncd.gov/report/2023-progress-report-toward-economic-security-the-impact-of-income-and-asset-limits-on-people-with-disabilities/    (accessed March 9, 2024).

and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[7]

12.     When digital content is properly formatted, it is universally accessible to everyone. When it's not, the content provider fails to communicate to individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[8]

13.     Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update and operate its website (hereinafter "Website") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

14.     Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

---

[7]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).

[8]     These factors often lead disabled individuals to abandon the process of purchasing items online after they begin. Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get- online-customers-to-complete-purchase.html (last accessed June 14, 2022) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

15. Defendant's denial of full and equal access to its Website and therefore denial of its goods and services offered thereby is a violation of Plaintiff's rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq*., the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*

16. Because Defendant's Website is not equally accessible to blind and visually impaired consumers, it violates the ADA, the NYSHRL, and the NYCHRL.  Plaintiff seeks a permanent injunction, actual and liquidated damages, and reasonable attorneys' fees and costs to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's Website will become and remain accessible to blind and visually impaired consumers.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq*., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq*.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts and continues to conduct a substantial and significant amount of business in this District via the internet regarding the subject Website addressed by this action.

20. Defendant is subject to personal jurisdiction in this District. Defendant has been and is committing the acts or omissions alleged herein in this District that caused some of the injury and violated the rights of Plaintiff and to other blind and visually impaired customers in this District under the ADA, the NYSHRL, and the NYCHRL. A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

21. In particular, Plaintiff has been denied the full use and enjoyment of the facilities, goods, and services offered to the general public through its Website. Plaintiff lost all opportunities to complete a consumer business transaction being offered by Defendant due to the discriminatory roadblocks faced as a result of Defendant's failure to provide online goods and services that he could effectively utilize as a visually impaired person.

22. Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access multiple times in the past, and now deters Plaintiff on a regular basis from accessing the Defendant's Website in the future without the aid of a sighted person to help him navigate, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

23. This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

24. Plaintiff Laurel Hilbert resides in Washington, D.C., but routinely visits his parents in New York City, including the relevant time period. In each location, he attempted to access Defendant's Website to complete transactions. Defendant's platform and Websites are used by many organizations and clubs. The running club which Mr. Hilbert is affiliated with uses the platform to allow blind and visually impaired runners to sign up for a run to

be matched with a sighted runner. Regrettably, he was unsuccessful in completing the transaction due to the inaccessibility of the Website, leaving him unable to run without a sighted partner.

25. Not only was Mr. Hilbert injured in fact on or about February 20 and April 26, 2023 and or or about November 3, 2023, respectively, but also, his future visits to New York to visit family and friends while maintaining his health and athletic club activities such that the inaccessibility of Defendant's Website will injure him again if it is not remediated in conformity with the Americans with Disabilities Act requirements.

26. Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§ 290, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq*.

27. Defendant Event Workforce Group (USA) Inc. doing business as Rosterfy ("Defendant") is and was at all relevant times a corporation incorporated and headquartered in Colorado, and does business in the Southern District of New York through its internet-based online Website.

28. Defendant owns and administers https://rosterfy.com and its goods and services online and has offered them to the general public through its Website, which are a public accommodation, as well as its physical location, within the definition of the ADA, 42 U.S.C. § 12181(7), the New York State Human Rights Law ("NYSHRL"), N.Y. CLS Exec. §§

290, *et seq*., the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq*.

### <u>NATURE OF ACTION</u>

29.    The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind and visually impaired persons alike.

30.    In today's tech-savvy world, blind and visually impaired people have the ability to access websites and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display.  This technology is known as screen-reading software.  Screen-reading software is currently the only method a blind or visually impaired person may independently access the internet.  Unless websites and/or mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are unable to fully access websites and the information, products, and goods contained thereon.

31.    Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them.  Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately.  Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular, screen-reading software programs available for a Windows computer.  "VoiceOver" is a popular program for Apple devices.

32.    For screen-reading software to function, the information on a website must be capable of being rendered into text.  If the website content is not capable of being rendered into text,

the blind or visually impaired user is unable to access the same content available to sighted users. For VoiceOver users such as Mr. Hilbert, relies on a Website's features and proper coding, including but not limited to "ARIA" ("accessible rich internet applications") in the Web Content Accessibility Guidelines ("WCAG"). ARIA provides what is presented visually for a visually impaired person.

33.    The international website standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 are well-established guidelines for making websites accessible to blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure their websites are accessible.

## STATEMENT OF FACTS

34.    Defendant Event Workforce Group (USA) Inc. doing business as Rosterfy ("Defendant") is a Colorado corporation that owns and operates the https://rosterfy.com online website offering features which should allow all consumers to access the goods and services provided via the internet throughout the United States, including the Southern District of New York.

35.    Defendant's Website offers its products and services to the public. The Website offers features which ought to allow and avail consumers the ability to peruse numerous functions to complete a sought-after business transaction, including, as in Mr. Hilbert's case, the ability to schedule running workouts as a member of Achilles International.

36.    Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a

proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the internet, online programs within websites and/or mobile applications. Plaintiff has visited and attempted to access Defendant's Website using a screen-reader on numerous occasions.

37. While visiting his parents in New York City between January 2023 through February 2023 and on or about April 26, 2023, Plaintiff visited and attempted to access Defendant's Website using screen-reading software in order to schedule a workout. Regrettably, he was unable to do so due to inaccessibility issues.

38. Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the Website's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

39. Mr. Hilbert owns and uses a MacBook and uses Safari as his main internet browser. Safari and MacBook harnesses Apple's "Voice-Over Software" which enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy websites by reading aloud functions on a website.

40. Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a website using its headings, links, buttons, tables, etc. Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a website offers. For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a website by using its headings. He will press "H" on his keyboard once "Quick Navigation" is enabled.

41. When websites fail to incorporate the proper and descriptive coding to mark what kinds of functions are on their website, not only does this prevent the "Quick Navigation"

functionality to locate the functions on the website but the read-aloud functions that lack description confuse software users like Mr. Hilbert who cannot rely on any visuals to navigate through and access a website.

**Inaccessibility of Website**

42.     On or about April 26, 2023, in June and again on or about November 3, 2023, Mr. Hilbert immediately noticed once again that the Website's buttons and links failed to abide the WCAG Guidelines due to their improper labelling and coding.

43.     Specifically, when Mr. Hilbert enabled Quick Navigation to navigate through the Website's buttons, he heard buttons labelled as "list view," and "Start Date/Time, menu pop up, button." These and other buttons on the Website were improperly labelled in that they failed to describe to Mr. Hilbert what content or functions were associated with each button, specifically what information Mr. Hilbert could see or view more of or move through to better understand.  Mr. Hilbert was particularly shocked that the Website used the label "menu pop up" because this is an outdated label and code that do not abide the current WCAG guideline as it failed to be descriptive enough for screen reader software users to understand what functions were associated with the button.  For Mr. Hilbert, improperly labelled functions failing to abide by the WCAG Guidelines leave him lost when navigating through the Website and unable to enjoy the Website's functions and capacities as his sighted counterparts.

44.     In addition to the mislabeled buttons, Defendant's Website fail to provide feedback and notifications to affirm whether or not Mr. Hilbert successfully interacted with its functions.

45.     When Mr. Hilbert clicked on the button labeled "list view," no notification was provided to affirm whether or not Mr. Hilbert interacted with it.  A lack of feedback and notifications

make it extremely difficult for blind and/or visually impaired persons like Mr. Hilbert to enjoy the Website like their sighted counterparts because they have to spend additional time searching through the Website to understand whether or not their selections were made, they were sent to a new page, etc.

46.    The Website's failure to implement appropriate and descriptive notifications and feedback was also evident with how its fields were coded as well.  As Mr. Hilbert clicked on the button labeled "Start Date/Time," he heard "text, day, field blank."  This notification failed to explain whether or not Mr. Hilbert needed to click on the text or just begin typing to input text into the field.  And, this issue remained when Mr. Hilbert attempted to type in a date as he heard after typing out his desired date, "text date field, blank."

47.    Also, the Website's "Start Date/Time" function did not let Mr. Hilbert input a workout date. Mr. Hilbert was unaware that he could not interact with the function despite typing in a date and was only able to confirm this after he moved his cursor to another part of the field and heard that the dates for available workouts were set from January 1, 2022 through December 31, 2023.  These were not the dates Mr. Hilbert attempted to input into the field.

48.    Lastly, when Mr. Hilbert tried to move through the available workouts from January 1, 2022 through December 31, 2023, his VoiceOver software could not locate and read aloud what kinds of workouts were available.

49.    Ultimately, in complete frustration and devastation, Mr. Hilbert was unable to schedule or review a workout.

50.    Defendant's Website is not coded properly so Quick Navigation did not work.  Screen reading software did not recognize proper HTML markings.

51.   For the visually impaired, this inaccessibility is especially paralyzing due to their inability to access the entirety of the Website as the screen reader software Plaintiff and those similarly situated depend on prevents them from navigating through the Website's key features, making certain selections on Defendant's Website impossible on their own.

52.   Mr. Hilbert attempted to search for the contact information of Defendant's customer service or accessibility pages to inform them of the issue he was having but due to the inaccessible Website, Mr. Hilbert was unable to find an accessibility statement nor any contact information to begin communicating with Defendant's support to inform it of the Website's issues.

53.   These access barriers effectively denied Plaintiff the ability to use and enjoy Defendant's Website the same way sighted individuals do.

54.   Upon information and belief, Defendant's policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendant's Website.  Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

55.   Due to Defendant's failure and refusal to remove access barriers to its Website, Plaintiff and visually impaired persons have been and are still being denied equal access to Defendant's Website, and the numerous goods, services and benefits offered to the public through the Website.

56.   The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past, and now deter Plaintiff on a regular basis from utilizing the Website, presently and in the future.

57. If the Website was equally accessible to all, Plaintiff could independently navigate the Website and access and complete the desired business transaction through Defendant's Website as sighted individuals do. He also would not have to use the services of a sighted person to perform simple transactions and interactions with Defendant's Website. It is humiliating for a visually impaired person to rely upon the largess of sighted strangers to navigate through the world. The internet world is no different.

58. Through his attempts to use the Website, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.

59. Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the Website, Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

a. Constructing and maintaining Website that is inaccessible to visually impaired individuals, including Plaintiff;

b. Failing to construct, update and maintain Website that is sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

c. Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

60. Defendant therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

61.     The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief

that Plaintiff seeks in this action.  In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an
> order to alter facilities to make such facilities readily accessible to and
> usable by individuals with disabilities … Where appropriate, injunctive
> relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

62.     Upon information and belief, because Defendant's Website has never been accessible, and

Defendant does not have, and never had, an adequate corporate policy that is reasonably

calculated to cause its Website to become and remain accessible, Plaintiff invokes 42 U.S.C.

§ 12188(a)(2) and seeks a permanent injunction requiring:

a.  That Defendant retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed

Upon Consultants") who shall assist it in improving the accessibility of its Website so

that the goods and services on them may be equally accessed and enjoyed by

individuals with vision-related disabilities;

b.  That Defendant work with the Mutually Agreed Upon Consultant to ensure that all

employees involved in its Website's development and content development be given

web accessibility training on a periodic basis at least two (2) times per year, including

onsite training to create accessible content at the design and development stages;

c.  That Defendant work with the Mutually Agreed Upon Consultant to perform an

automated accessibility audit on a periodic basis at least two (2) times per year to

evaluate whether its Website may be equally accessed and enjoyed by individuals with

vision-related disabilities on an ongoing basis;

d.  That Defendant work with the Mutually Agreed Upon Consultant to perform end-user

accessibility/usability testing on a periodic basis at least two (2) times per year with

DocuSign Envelope ID: 22A2DDED-D989-4A5B-A6EE-1BF8F56433B9

said testing to be performed by individuals with various disabilities to evaluate whether its Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendant work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its Website, along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendant and its computer and/or internet experts monitor Defendant's Website for up to two (2) years after the Mutually Agreed Upon Consultant validates that the Website is free of accessibility errors/violations to ensure that it has adopted and implemented adequate accessibility policies.

g.  That Defendant provide Plaintiff's counsel and this Court a report every six (6) months of its efforts to comply and its continued compliance with the ADA, including a representation and warranty that its Website is free of accessibility errors/violations and to ensure that it has adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

63.  Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies.  To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the website and/or mobile applications to remain accessible, Defendant's Website must be

DocuSign Envelope ID: 22A2DDED-D989-4A5B-A6EE-1BF8F56433B9

reviewed on a periodic basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

64.    Although Defendant may currently have centralized policies regarding maintaining, updating and operating its Website, Defendant lacks a plan and policy reasonably calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

65.    Defendant has, upon information and belief, invested substantial sums in developing and maintaining its Website and has generated significant revenue from its Website.  These amounts are far greater than the associated cost of making its Website equally accessible to visually impaired customers.

**66.**    Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the Website, violating their rights.

### FIRST CAUSE OF ACTION
### <u>Violation of the Americans with Disabilities Act</u>
### (42 U.S.C. § 12181 *et seq.*)

67.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

68.    Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

69. Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Martinez v. Gutsy LLC*, 2022 U.S. Dist. LEXIS 214830, 2022 WL 17303830, at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to dismiss, holding that plaintiff plausibly stated a claim of discrimination due to allegedly inaccessible website); *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, 2017 WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (same); *Romero v. 88 Acres Foods, Inc.*, 580 F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases); *see also Tavarez v. Moo Organic Chocolates, LLC*, No. 21-CV-9816 (VEC), 2022 U.S. Dist. LEXIS 154249, at *2 (S.D.N.Y. Aug. 26, 2022) ("concur[ing] with the vast majority of other judges in this District who have decided the issue that a 'place of public accommodation' includes public-facing websites that are not tethered to a physical location" while "not[ing] that at least seven of its colleagues, one of whom has since ascended to the Second Circuit, have found that Title III of the ADA applies to websites"); *Wilson v. Fabric Cellar, Inc.*, No. 20-CV-244S, 2021 U.S. Dist. LEXIS 130536 (W.D.N.Y. July 13, 2021) (choosing to "assume without deciding" that the website is a place of public accommodation based on the weight of the case law in the circuit); *Slade v. Life Spectacular, Inc.*, No. 22-CV-0037 (ALC), 2022 U.S. Dist. LEXIS 220079, at *9 (S.D.N.Y. Dec. 5, 2022); *Panarese v. Sell It Soc., LLC*, No. 19-CV-3211 (ARR) (RML), 2020 U.S. Dist. LEXIS 119002, at *2 (E.D.N.Y. July 2, 2020), *adopted by* 2020 U.S. Dist. LEXIS 139893, (Aug. 5, 2020); *Reed v. 1-800-Flowers.com, Inc.*, 327 F. Supp. 3d 539, 550 (E.D.N.Y. 2018); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).

70. The Website is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

71.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

72.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

73.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

74.     The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

75.     Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

DocuSign Envelope ID: 22A2DDED-D989-4A5B-A6EE-1BF8E56433B9

76.     Furthermore, Plaintiff has been denied full and equal access to the Website offered by
        Defendant, has not been provided services that are provided to other patrons who are not
        disabled, and has been provided services that are inferior to the services provided to non-
        disabled persons.  Defendant has failed to take any prompt and equitable steps to remedy
        its discriminatory conduct.  These violations are ongoing.

77.     Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and
        incorporated therein, Plaintiff requests relief as set forth below.

### SECOND CAUSE OF ACTION
### Violation of the NYSHRL
### (N.Y. CLS Exec. §§ 290, *et seq.*)

78.     Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges
        every allegation of the preceding paragraphs as if fully set forth herein.

79.     The New York State Human Rights Law ("NYSHRL") guarantees "equal opportunity to
        enjoy a full and productive life" whereby "every individual shall have an equal opportunity
        to participate fully in the economic, cultural and intellectual life of the state" as the state
        works towards "eliminat[ing] and prevent[ing] discrimination in … places of public
        accommodation … and to take other actions against discrimination[.]" N.Y. CLS Exec. §
        290(3).

80.     The NYSHRL also states: "The term 'disability' means (a) a physical, mental or medical
        impairment resulting from anatomical, physiological, genetic or neurological conditions
        which prevents the exercise of a normal bodily function or is demonstrable by medically
        accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment
        or (c) a condition regarded by others as such an impairment[.]" N.Y. CLS Exec. § 292(21).

81. Plaintiff has a physical disability as a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.

82. Pursuant to the NYSHRL: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, ... because of the ... disability, ..., of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof[.]" N.Y. CLS Exec. § 296(2)(a).

83. Defendant is systematically violating the NYSHRL.

84. Defendant is a "place of public accommodation" within the meaning of the NYSHRL because it is an "establishment dealing with goods and services of any kind," N.Y. CLS Exec. § 292(9), which includes the provision of Website to consumers in the State of New York.

85. Defendant's Website is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who is visually impaired. This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public. Defendant has violated the NYSHRL by denying visually impaired customers the services and products provided by its Website. These violations are ongoing.

86. Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the NYSHRL because Defendant constructed and/or maintains its Website, which is inaccessible to Plaintiff, knowingly maintains its Website in its inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

87.    Defendant is also violating the NYSHRL because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* The U.S. District Court for the Southern District of New York has held that a claim for disability discrimination under the NYSHRL is governed by the same legal standards as the ADA. *Range v. 535 Broadway Grp. LLC*, 2019 U.S. Dist. LEXIS 149905 at *16 (S.D.N.Y. 2019) (*citing Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) (citation omitted)); *see also Sullivan v. Study.com LLC*, 2019 U.S. Dist. LEXIS 47073 at *16 (S.D.N.Y. 2019) ("It is true that the NYSHRL … [is] governed by the same legal standards that courts apply to ADA disability discrimination claims.").

88.    Defendant's actions were and are in violation of the ADA and NYSHRL and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination. N.Y. CLS Exec. §§ 297(4)(c)(i) – (ii).

89.    Plaintiff and those similarly situated are also entitled to a preliminary and permanent injunction enjoining Defendant from violating the NYSHRL and requiring Defendant to take the steps necessary to make its Website readily accessible to and usable by visually impaired individuals. N.Y. CLS Exec. §§ 297(4)(c)(i) – (ii).

90.    Defendant's denial of accessible Website and its discrimination against Plaintiff and those similarly situated renders it liable for each and every offense for compensatory damages in an amount to be determined by a jury and civil penalties that may be determined by the Court.  N.Y. CLS Exec. §§ 297(4)(c)(iii) – (vi).

## THIRD CAUSE OF ACTION
## Violation of the NYCHRL
### (N.Y.C. Admin. Code §§ 8-101, *et seq.*)

91.     Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

92.     The New York City Human Rights Law ("NYCHRL") declares that "there is no greater danger to the health, morals, safety and welfare to the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on … disability[.]" N.Y.C. Admin. Code § 8-101.

93.     The NYCHRL defines a disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment. … The term 'physical, medical, mental, or psychological impairment' means: [a]n impairment of any system of the body; including, but not limited to, the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system[.]" N.Y.C. Admin. Code § 8-102.

94.     Plaintiff has a physical disability as a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.

95.     Pursuant to the NYCHRL: "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation: [b]ecause of any person's actual or perceived … disability, …, directly or indirectly: [t]o refuse, withhold

from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation[.]" N.Y.C. Admin. Code § 8-107(4)(1)(a).

96.     Defendant is a "place of public accommodation" within the meaning of the NYCHRL because it is a *provider* "of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available[,]" N.Y.C. Admin. Code 8-102, which includes the provision of Websites to consumers in New York City.

97.     Defendant is systematically violating the NYCHRL.

98.     Defendant's Website is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who is visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the NYCHRL by denying visually impaired customers the services and products provided by the Website.  These violations are ongoing.

99.     Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the NYCHRL because Defendant constructed and/or maintains its Website, which is inaccessible to Plaintiff, knowingly maintains its Website in this inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

100.    Defendant is also violating the NYCHRL because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. §§ 12101 *et seq.*

and the NYSHRL, N.Y. CLS Exec. §§ 290 *et seq.*  The U.S. District Court for the Southern District of New York has held that the NYCHRL has a "one-way ratchet whereby the ADA standard constitutes its floor."  *Sullivan v. Study.com LLC*, 2019 U.S. Dist. LEXIS 47073 at *16 (S.D.N.Y. 2019) (*citing Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).  Specifically, the Second Circuit Court of Appeals has affirmed that the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts" where interpretation of state or federal statutes with similar wording "may be used to aid in interpretation of [the NYCHRL], viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the [NYCHRL] cannot fall." *Leoffler*, 582 F.3d at 278 (*quoting* THE LOCAL CIVIL RIGHTS RESTORATION ACT OF 2005, N.Y.C. Local Law No. 85 (2005) at § 1).

101. Defendant's actions were and are in violation of the ADA, NYSHRL, and the NYCHRL and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination.

102. Plaintiff and those similarly situated are also entitled to a preliminary and permanent injunction enjoining Defendant from violating the NYCHRL and requiring Defendant to take the steps necessary to make its Website readily accessible to and usable by visually impaired individuals. N.Y.C. Admin. Code § 8-120(a).

103. Defendant's denial of accessible Website and its discrimination against Plaintiff and those similarly situated renders it liable for each and every offense for compensatory damages in an amount to be determined by a jury, civil penalties, and reasonable attorney's fees and costs that may be determined by the Court.  N.Y.C. Admin. Code §§ 8-120(a), 8-126(a).

DocuSign Envelope ID: 22A2DDED-D988-4A5B-A6EE-18F8E56433B9

## FOURTH CAUSE OF ACTION
### Declaratory Relief

104.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

105.    An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendant denies that its Website contains access barriers denying blind and/or visually impaired customers the full and equal access to the products, services and facilities contained in its Website, which Defendant owns, operates and controls, fails to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act, the NYSHRL, and the NYCHRL, prohibiting discrimination against the blind and visually impaired.

106.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.    For a judgment that Defendant violated Plaintiff's rights under the ADA, the NYSHRL, and the NYCHRL;

B.    A preliminary and permanent injunction prohibiting Defendant from violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.*, the NYSHRL, and the NYCHRL;

C.    A preliminary and permanent injunction requiring Defendant to take all steps necessary to make its Website fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Website is regularly accessible to and usable by blind and visually impaired individuals;

D.      A declaration that Defendant owns, maintains, and/or operates its Website in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA, the NYSHRL, and the NYCHRL;

E.      Economic, compensatory and/or punitive damages under the NYSHRL, and/or NYCHRL, as applicable, in an amount to be determined at trial;

F.      Pre- and post-judgment interest;

G.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.      Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: March 11, 2024                              Respectfully submitted,

**ERIC SIEGEL LAW, PLLC**

By    /s/ Eric L. Siegel
Eric L. Siegel (Bar No. 2344935)
esiegel@ericsiegellaw.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(771) 220-6116 (Office)
(202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*

**VERIFICATION**

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendant's Websites and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

3/10/2024

_____

Date

_____

Laurel Hilbert, Plaintiff